# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT DEPARTMENT
                                                     CIVIL ACTION NO.:

Dr. ALEXANDER LIPIN,                        )
              Complainant.                  )
                                            )
        v.                                  )
                                            )
STEWARD HEALTHCARE SYSTEM, LLC.             )
STEWARD MEDICAL GROUP, INC., and            )
HOLY FAMILY HOSPITAL                        )
              Respondents.                  )
                                            )

## COMPLAINT

This is a complaint by a highly regarded psychiatrist who was employed by a hospital for eight years, and was abruptly terminated after he became sick. Plaintiff took time off from his job to recover, however, his employer not only interfered with his right to do so, but also retaliated against him for having exercised such rights. Defendants' actions are in violation of the Family and Medical Leave Act, the American with Disabilities Act, and Chapter 151B.

### Parties

1. Plaintiff, Dr. Alexander Lipin ("Dr. Lipin"), is an individual residing at 350 Revere Beach Blvd., 9-10P, Revere, MA 02151.

2. Defendant, Steward Healthcare System, LLC ("Steward") is a foreign limited liability company incorporated in Delaware, with a principal office at 500 Boylston Street, Boston, MA 02116, and is the largest community care organization in Massachusetts.

3. Defendant, Steward Medical Group, Inc. ("SMG"), is a Massachusetts nonprofit corporation with a principal office at 500 Boylston Street, Boston, MA 02116.

4. Defendant, Holy Family Hospital ("Holy Family Hospital"), is a member of SMG, and is a hospital located at 70 East Street, Methuen, MA.

## Background facts

5. Dr. Lipin is a licensed psychiatrist, who after earning a medical degree from the Riga Medical Academy in Latvia, was an attending physician in Latvia for thirteen years.

6. After moving to the United States, Dr. Lipin was a research fellow at Brigham & Women's Hospital of Boston from 1993-1996. He then completed a residency in psychiatry at St. Elizabeth's Medical Center of Boston, and a two-year fellowship in Child and Adolescent Psychiatry at New England Medical Center, both of TUFTS University Medical School.

7. Thereafter, Dr. Lipin began working as a staff psychiatrist at various hospitals in Massachusetts for over 13 years, and has continued to do so to date.

8. Dr. Lipin also completed comprehensive courses in electroconvulsive therapy at Duke University and Columbia University.

9. Dr. Lipin currently holds the position of Chief Psychiatrist at Anna Jacques Hospital.

## Dr. Lipin's employment with Defendants

10. Dr. Lipin began working as an attending psychiatrist at Holy Family Hospital in May of 2007, initially on a per diem basis, but shortly thereafter, as a full time psychiatrist.

11. In or about January 2010, SMG entered into a written employment agreement with Dr. Lipin, to work as a full time staff psychiatrist at Holy Family Hospital ("Agreement"). See Exhibit A.

12. The Agreement automatically renewed for successive one-year terms, most recently on January 1, 2015 for a term ending December 31, 2015.

13. Dr. Lipin regularly worked at least 40 hours of clinical services per week at Holy Family Hospital, and also routinely agreed to work on-call, as needed.

14. Dr. Lipin's workday at Holy Family Hospital began around 2:00 pm, and continued until he finished seeing patients.

15. As part of his employment, Holy Family Hospital granted Dr. Lipin hospital privileges, which allowed him to admit patients and carry out his duties at the hospital.

16. Although Dr. Lipin's annual salary was $170,000.00 per the Agreement, he earned approximately $280,000.00 per year given the number of hours he actually worked at Holy Family Hospital.

17. Dr. Lipin reported to the Chair of Holy Family Hospital's Center for Behavioral Health, who, in turn, reported to Dr. John Alexander, Vice President of Medical Affairs.

18. Dr. Lipin also worked as a staff psychiatrist at Anna Jacques Hospital in the weekday mornings before going to work at Holy Family Hospital.

19. Neither Dr. Lipin's Agreement nor Defendants' policies prohibited Dr. Lipin from working a second job at Anna Jacques Hospital.

20. Holy Family Hospital was aware of Dr. Lipin's employment at Anna Jacques Hospital.

21. In the late fall of 2014, Holy Family Hospital received some complaints about Dr. Lipin's interactions with clinicians and other staff.

22. As a result, Holy Family Hospital held meetings with Dr. Lipin on October 15th and October 20th of 2014.  During these meetings, Dr. Lipin stated that his primary concern is good and safe patient care, and was concerned with the content of the presentations made by the access team.

23. Holy Family Hospital acknowledged that this issue had been raised before not just by Dr. Lipin, but by others as well, and would look into the matter.

24. Dr. Alexander then explained his expectations to Dr. Lipin in writing. Defendants took no further action at that time.

25. On November 16, 2014, concerned for his safety and the safety of others at the hospital, Dr. Lipin contacted the police department to confirm whether a disruptive patient in the emergency room had any outstanding warrants.

26. On November 25, 2014, Dr. Alexander and Elizabeth Brown from Corporate Compliance met with Dr. Lipin to discuss the November 16th incident, concerned about a possible federal Health Insurance Portability and Accountability Act ("HIPAA") violation.

27. After the meeting, Dr. Alexander wanted to terminate Dr. Lipin's employment either with or without cause.

28. However, SMG's President, Dr. George Clairmont took no action, and wanted to know what the hospital compliance's position was before making a decision. Compliance ultimately concluded that the November 16th incident did not rise to the level of a reportable breach of HIPAA.

29. In early December 2014, Dr. Lipin met with Dr. Clairmont and Senior Director of Human Resources Danielle Mulholland. During this meeting, Dr. Clairmont, who had the authority to terminate Dr. Lipin's Agreement, assured Dr. Lipin that he had no intention of firing him and that they were not talking about any penalties.

30. On January 1, 2015, Defendants renewed the Agreement to employ Dr. Lipin for at least another year.

31. Thereafter, Defendants took no further action regarding Dr. Lipin's employment nor did they discuss termination until almost two months later, after Dr. Lipin became sick.

Dr. Lipin's illness

32. On January 26, 2015, Dr. Lipin experienced pain in his chest and on his right side. He was seen at the emergency room, and was diagnosed with pneumonia.

33. Dr. Lipin's pneumonia prevented him from working a continuous block of time and as result, was a handicap that substantially limited the major life activity of working a normal 8-hour day at any job.

34. As per Holy Family Hospital's instructions and Steward's Leave of Absence Policy, Dr. Lipin completed SMG's Leave of Absence Notification in order to apply for leave under the Family and Medical Leave Act ("FMLA").

35. Dr. Lipin was entitled to and approved for FMLA leave, from January 27 to March 2. See Exhibit B.

36. While on FMLA leave from Holy Family Hospital, Dr. Lipin continued to work at Anna Jacques Hospital because he was able to work for a few hours in the morning, which was the time of day he was scheduled to work at Anna Jacques Hospital.

37. As the day progressed, Dr. Lipin's symptoms worsened, and he would then go home to rest the remainder of the day, which is why Dr. Lipin requested a leave of absence from Holy Family Hospital, where he worked afternoons and into the evening hours.

38. In or around mid-February, 2015, Holy Family Hospital learned that Dr. Lipin continued to work at Anna Jacques Hospital while on medical leave.

39. Dr. Alexander spoke to two staff members at Anna Jacques Hospital to confirm Dr. Lipin's continued employment there.

40. However, neither Dr. Alexander nor anyone from Holy Family Hospital or SMG spoke to Dr. Lipin about why he was able to continue working at Anna Jacques Hospital while he was on a leave of absence from Holy Family Hospital.

41. Instead, Defendants wrongly assumed Dr. Lipin abused his leave of absence, unaware that the FMLA allowed Dr. Lipin to continue working at one job while on FMLA leave from another.

42. Dr. Lipin did not misrepresent nor was he dishonest about his continued employment at Anna Jacques Hospital while on leave from Holy Family Hospital.

43. Defendants were upset that Dr. Lipin, although he was within his legal rights to do so, chose to work a part-time schedule at Anna Jacques Hospital, instead of discussing a potential part-time schedule with Holy Family Hospital.

44. On February 20, Dr. Lipin stated that he required another one week of recovery and would not be able to return to work until Monday, March 2.

<u>Termination without cause</u>

45. On February 23, 2015, SMG sent a letter to Dr. Lipin stating that his employment would be terminated on ninety days' notice, effective May 24, 2015. See <u>Exhibit C</u>.

46. Defendants elected to invoke the provision of the Agreement providing for termination without cause.

47. SMG did not invoke Section 3.2(a) of the Agreement, which permits immediate termination for cause, including for unprofessional or unethical conduct.

48. G.L. c. 149, § 52C requires an employer to include in a personnel file anything that "is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation or disciplinary action."

49. Aside from the letter of termination, there is no document in Dr. Lipin's personnel file that states SMG or Holy Family Hospital considered termination for cause.

50. Moreover, Defendants failed to provide any reason for its decision to terminate Dr. Lipin's employment until May of 2016, in response to the charge of discrimination filed by Dr. Lipin at the Massachusetts Commission Against Discrimination.

51. The Professional Conduct Committee ("PCC") of Holy Family Hospital, which had the authority to grant and revoke Dr. Lipin's hospital privileges, reviewed the practice-related concerns of Dr. Lipin and recommended that he be placed on an improvement plan.

52. The PCC did not recommend termination or revocation of Dr. Lipin's hospital privileges.

### COUNT I
### The Family and Medical Leave Act, 29 U.S.C. § 2601, et seq.

53. Dr. Lipin alleges and incorporates by reference all of the above allegations.

54. Dr. Lipin was entitled to and approved for FMLA leave from January 27 to March 2.

55. In accordance with the FMLA, Dr. Lipin had the right to return to work in the same or similar position at the end of his leave of absence.

56. In accordance with the FMLA, Dr. Lipin also had the right to continue working at one job, while on FMLA leave from another.

57. Defendants interfered with and denied Dr. Lipin's rights under the FMLA when it failed to return him to work at the end of his leave of absence, in violation of 29 U.S.C. § 2615.

58. Defendants interfered with and denied Dr. Lipin's rights under the FMLA when it terminated his employment, in violation of 29 U.S.C. § 2615.

59. Defendants retaliated against Dr. Lipin for having exercised his right under the FMLA to continue working at Anna Jacques Hospital, while on an FMLA-approved leave of absence from Holy Family Hospital.

60. As a result of the above actions, Defendants violated the FMLA.

61. Defendants' unlawful mistreatment of Dr. Lipin has caused him to suffer financial losses and endure significant emotional distress.

## COUNT II
### The American with Disabilities Act, 42 U.S.C. §. 12203

62. Dr. Lipin alleges and incorporates by reference all of the above allegations.

63. Dr. Lipin was substantially limited from the major life activity of working a normal 8-hour work day.

64. Dr. Lipin was entitled to the interactive dialogue, as required by the American with Disabilities Act, 42 U.S.C. § 12203 ("ADA").

65. Defendants failed to engage in an interactive dialogue when Dr. Lipin requested an additional week of leave of absence, and instead, terminated his employment.

66. Defendants' actions were in violation of the ADA.

67. As a result, Dr. Lipin has suffered financial losses and endured significant emotional distress.

## COUNT III
### Chapter 151B

68. Dr. Lipin alleges and incorporates by reference all of the above allegations.

69. Dr. Lipin was substantially limited from the major life activity of working a normal 8-hour work day.

70. Dr. Lipin was entitled to the interactive dialogue, as required by G. L. c. 151B, s. 4(16).

71. Defendants it failed to engage in an interactive dialogue with Dr. Lipin when he requested one additional week of leave of absence and instead, terminated his employment.

72. Defendants' action were in violation of Chapter 151B.

73. Defendants' mistreatment of Dr. Lipin has caused him to suffer financial losses and endure emotional distress.

## REQUESTS FOR RELIEF

WHEREFORE, Dr. Lipin respectfully requests that this Court grant the following relief:

1. Lost wages, punitive damages and emotional distress damages due under G.L. c. 151B and the ADA.

2. Lost wages, including interest and liquidated damages, under the FMLA.

3. Reasonable attorneys' fees as well as the costs of this action; and

4. Such other and further relief as a court may deem necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
DR. ALEXANDER LIPIN
By his attorneys,

Kavita M. Goyal (BBO # 654013)
Joel Rosen (BBO # 567788)
Rosen Law Office, P.C.
204 Andover Street, Ste. 402
Andover, MA 01810
(978) 474-0100
kgoyal@rosenlawoffice.com
jrosen@rosenlawoffice.com

Date: September 12, 2016

## VERIFICATION

I, Dr. Alexander Lipin, on oath, state that I have read the above Complaint, including its corresponding exhibits, and that the facts averred therein are true and, as to statements made upon on information and belief, I believe those to be true.

September 6, 2016

Dr. Alexander Lipin

9

# EXHIBIT A

## PHYSICIAN EMPLOYMENT AGREEMENT

**THIS PHYSICIAN EMPLOYMENT AGREEMENT** (this "Agreement") is made and entered into as of the Effective Date (as defined on Exhibit A) by and between Caritas Christi Physician Network, Inc. ("CCPN"), a Massachusetts not-for-profit corporation and the Physician (as identified on Exhibit A), an individual physician, licensed to practice medicine in Massachusetts (the "Physician"). CCPN and the Physician may be referred to herein, individually as a "Party" or collectively as the "Parties."

### RECITALS

**WHEREAS**, CCPN is an affiliate of Caritas Christi and in furtherance of its charitable purposes, employs qualified physicians to provide clinical, educational, research and medical-administrative services under its auspices, and to the patients of Caritas Christi hospitals and other affiliated health care facilities (each a "Hospital"); and

**WHEREAS**, CCPN desires to engage the Physician to provide certain clinical, educational, research and medical-administrative services as described hereafter; and

**WHEREAS**, the Physician is willing and able to provide such clinical, educational, research and medical-administrative services for CCPN in accordance with the provisions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter expressed, other valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1. <u>Employment</u>. CCPN hereby employs Physician and Physician hereby accepts employment by CCPN upon the terms and conditions set forth herein.

2. <u>Physician's Services and Responsibilities</u>.

    2.1 <u>Effective Date</u>. Physician shall commence employment under this Agreement on the Effective Date (as defined on Exhibit A).

    2.2 <u>Generally</u>. Physician shall provide professional medical services to patients of CCPN at the practice location(s) and the Assigned Hospital(s) specified on Exhibit A, and at such other locations as CCPN may establish or may reasonably direct Physician from time to time, in accordance with CCPN's assignment, coverage and on-call schedules, which schedules shall be designed to assure that all of the medical needs of patients of CCPN and the Assigned Hospitals, including urgent and emergency needs, are met in a competent, timely and responsive manner. Physician shall, on average, devote a minimum of forty (40) hours per week of scheduled professional services relating to treatment of patients of CCPN or, at the direction of CCPN, of the Assigned Hospital(s). Physician's specific employment schedule shall be reasonably determined by CCPN from time to time and may be revised or adjusted by CCPN to accommodate CCPN's staffing needs. Physician shall provide clinical services in Physician's Specialty (as defined in Exhibit A). The Physician covenants and agrees to perform all services hereunder capably, faithfully,

and to the best of the Physician's ability.  The general allocation of physician's time shall be as set forth on Exhibit A.

2.3     Call Coverage.  Physician shall be assigned a share of night and weekend coverage and call responsibility, according to a schedule established by CCPN from time to time.  CCPN shall attempt to accommodate reasonable scheduling requests of Physician, but all schedules shall ultimately be determined at the sole discretion of CCPN.  Physician shall comply with on-call and coverage requirements of each Assigned Hospital.

2.4     Adjustment.  Notwithstanding any other provision of this Agreement, CCPN shall reasonably determine and may adjust from time to time the specific professional duties to be performed by the Physician and the means and manner by which those duties shall be performed, such duties to be consistent with the Physician's training and experience.

2.5     Physician's Representations and Warranties.   Physician represents and warrants at all times during the term of this Agreement that:

(a)     Physician is duly licensed, registered, and in good standing under the laws of the Commonwealth of Massachusetts to engage in the practice of medicine, and that said license and registration have not been suspended, revoked or restricted in any manner in this Commonwealth or any other state or commonwealth.

(b)     Physician is qualified for and has applied for, or will apply for, and has obtained, or will timely obtain, membership in good standing on the Medical Staff of each Assigned Hospital, with appropriate privileges in Physician's Specialty; provided that this Agreement is not, and shall not be construed as, any form of guarantee or assurance that Physician shall receive necessary Medical Staff membership or privileges for purposes of discharging Physician's responsibilities hereunder.   The Medical Staff application, appointment and reappointment processes and the granting of privileges shall be solely governed by the Medical Staff Bylaws of the respective Assigned Hospital in effect from time to time.

(c)     Physician has current controlled substances registrations issued by the appropriate federal and state governmental agencies, which registrations have not been surrendered, suspended, revoked or restricted in any manner.

(d)     Physician is board certified in Physician's Specialty, board eligible in Physician's Specialty, or maintains comparable skills or otherwise meets similarly reasonable standards consistent with appropriate professional standards as determined in good faith by the President of CCPN in consultation with the applicable Department Chair.

(e)     Physician has disclosed and will disclose to CCPN the following matters, whether occurring at any time prior to or during the term of this Agreement: (i) any malpractice suit, claim (whether or not filed in court), settlement, settlement allocation, judgment, verdict or decree against Physician; (ii) any disciplinary, peer review or professional review investigation, proceeding or action instituted against Physician by any licensure board, hospital, medical school, health care facility or entity, professional society

or association, third party payor, peer review or professional review committee or body, or governmental agency; (iii) any criminal felony conviction of Physician and any criminal misdemeanor conviction or period of incarceration resulting from a misdemeanor conviction of Physician within the past five (5) years, excluding speeding and minor traffic violations; provided that if Physician has been convicted of any felony or misdemeanor within the past five (5) years, then Physician must disclose all prior criminal convictions; (iv) any allegation against Physician of filing false health care claims, violating anti-kickback laws, or engaging in other billing improprieties; (v) any period during which Physician, with or without reasonable accommodation, is or was unable to perform the essential functions of the practice of medicine, or during which Physician poses or may pose a direct threat to the health, safety or well-being of any patient, employee or other individual; (vi) any current or past use of illegal drugs, or any current or past dependency on alcohol or controlled substances; (vii) any allegation, or any investigation or proceeding based on any allegation, against Physician, of violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the practice of medicine; (viii) any denial or withdrawal of an application in any state for licensure as a physician, for medical staff privileges at any hospital or other health care entity, for board certification or recertification, for participation in any third party payment program, for state or federal controlled substances registration, or for malpractice insurance; (ix) being listed on any of the Office of the Inspector General's Exclusion Database; or (x) Physician's expulsion from the Massachusetts Physician Health Services Program.

(f)     Physician shall abide by all Bylaws, rules, regulations, policies or directives of CCPN, as well as the Medical Staff Bylaws and applicable department and/or division rules of the Assigned Hospital(s).

(g)     In connection with the provision of medical services hereunder, Physician shall use the equipment, instruments, pharmaceuticals and supplies of CCPN and the Assigned Hospitals for the purposes for which they are intended and in a manner consistent with sound medical practice.

(h)     Physician has not been suspended or excluded from participating in any federal, state or private third party payor network or program and Physician shall participate in Medicare, Medicaid, other federal and state reimbursement programs, Blue Cross/Blue Shield, and other commercial insurance programs, and under the plan of any commercial insurer, health maintenance organization, preferred provider organization or other health benefit program with which CCPN may contract or affiliate ("Payors").

(i)     Physician has disclosed and will disclose to CCPN the existence of: (i) all student loans or federal scholarships with the United States pursuant to the National Health Service Corps Scholarship Program, the Physician Shortage Area Scholarship Program or the Health Education Assistance Loan Program (together, "Student Loans"); (ii) any default or notice of default by Physician of a Student Loan; (iii) any repayment agreement between Physician and the Secretary of Health and Human Services ("HHS") entered into because of a default on a student loan ("Repayment Agreement"); and (iv) any default or notice of default on a Repayment Agreement.

3

2.6     Standards of Practice. The Physician's services hereunder shall at all times be rendered in a competent and professional manner, consistent with quality assurance standards of CCPN and each Assigned Hospital and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Physician or any Assigned Hospital; applicable standards of the Joint Commission; the Physician's board certifying organization if applicable; and then-currently accepted and approved methods and practices.

2.7     Catholic Health Care Services. The Physician acknowledges and agrees that in fulfilling the Physician's obligations under this Agreement, the Physician shall at all times do so in a manner which is consistent with the teachings of the Roman Catholic Church as enunciated by the Holy Father and the Bishops in communion with him, including, but not limited to, the Ethical and Religious Directives for Catholic Health Care Services as in effect from time to time. In this regard the Parties shall rely upon and defer to the teaching authority of the Roman Catholic Archbishop of Boston. The Physician acknowledges receipt of a copy of the Ethical and Religious Directives as in effect on the Effective Date.

2.8     Other Caritas Policies. Notwithstanding any provision herein to the contrary, the Physician shall at all times be subject to and comply with all Caritas policies applicable to physicians.

2.9     Maintenance of Medical Records. The Physician agrees to enter in his or her patient's medical record all relevant medical information on a timely basis in accordance with the requirements of CCPN, Medical Staff Bylaws of the Assigned Hospitals (as applicable), and Massachusetts laws and regulations. The Physician acknowledges and agrees that in furtherance of clinical integration, the CCPN medical record for each patient must include all relevant medical information, including without limitation, clinical test results and interpretation summaries of procedures performed on the patient either at an Assigned Hospital or at any other facility, including a facility that is not affiliated with CCPN or Caritas Christi.

3.     Term and Termination.

3.1     Term. Unless sooner terminated as provided herein, this Agreement shall remain in full force and effect for that number of years identified on Exhibit A, commencing on the Effective Date. Unless sooner terminated as provided herein, upon the expiration of the initial term, this Agreement shall automatically renew for successive one (1) year terms.

3.2     Termination.

(a)     CPN may immediately terminate this Agreement upon the occurrence of any of the following:

(i)     Physician's death;

4

(ii)     Physician's disability for a continuous period in excess of ninety (90) days due to a mental or physical condition (other than pregnancy) that is determined by an independent medical examiner selected by mutual agreement of the parties to be a permanently disabling condition or a condition that will impair Physician's ability to perform Physician's obligations hereunder beyond said ninety (90) day period;

(iii)     Physician's license to practice medicine or Physician's medical staff membership or privileges at any Assigned Hospital or any other hospital or healthcare facility are denied, suspended, revoked, not renewed, or restricted in any manner. This provision shall not apply to a decision by a Hospital to not allow a Physician to perform certain clinical procedures as part of their application for medical staff privileges;

(iv)     Bankruptcy, insolvency or cessation of operations of CCPN; any voluntary or involuntary petition for bankruptcy, dissolution, liquidation or winding-up of the affairs of CCPN; or any assignment by CCPN or for the benefit of creditors;

(v)     Physician engages in unprofessional, unethical or fraudulent conduct, as determined by CCPN (including without limitation, any form of harassment of any individual(s)); or: (i) is found guilty or liable of such conduct by any court, governmental authority or board, institution, organization, or professional society having jurisdiction to judge the conduct of Physician; (ii) Physician enters into a settlement agreement pertaining to an allegation against the Physician for unprofessional, unethical or fraudulent conduct; or (iii) Physician's conduct is proven to be libelous or slanderous to CCPN;

(vi)     Physician is excluded from Medicare, Medicaid, or any other federal health care program;

(vii)     Physician's primary malpractice insurance lapses or is terminated due to Physician's claims experience or Physician's error or omission;

(viii)   Breach by Physician of any term of this Agreement (including, without limitation, Section 8), which breach has not been cured to the satisfaction of CCPN within thirty (30) days after notice of such breach;

(ix)     Default or notice of default on a Student Loan, or default or notice of default on a Repayment Agreement;

(x)     Refusal by the Physician to enter into a Repayment Agreement with HHS;

(xi)     Suspension or exclusion of the Physician from any third party payment program in which CCPN is a participating provider; or

(xii)   Violation of any policy or procedure contained within the CCPN Physician Policies and Procedures Manual.

(b)     Physician may terminate his/her Physician Employment Agreement if CCPN breaches any material term of the Physician's Employment Agreement, which breach has not been cured within thirty (30) days after notice of such breach.

(c)     Either CCPN or Physician may terminate Physician's Employment Agreement, with or without cause, without penalty, at any time upon at least ninety (90) days' prior written notice to the other party.

3.3     Effect of Termination.

(a)     Upon termination of a Physician's employment with CCPN, Physician shall be entitled to receive such base salary and fringe benefits, if any, accrued under the terms of this Agreement, but unpaid, as of the date of said termination, less any amounts owed by Physician to CCPN pursuant to this Agreement. Upon termination, Physician shall not be entitled to receive compensation for unused personal or sick days. Payment for accrued vacation days shall be subject to CCPN's vacation policies then in effect. Except as may be provided for in this Agreement, all CCPN employee benefits, including but not limited to the provision of professional liability insurance coverage, shall terminate on the effective date of termination.

(b)     Upon termination of a Physician's employment with CCPN, whether by mutual agreement or otherwise, neither party shall have any further obligation hereunder except for: (i) obligations accruing prior to the date of termination in accordance with this Agreement; and (ii) obligations, promises, or covenants which are expressly made to extend beyond the term of this Agreement.

(c)     Upon termination of a Physician's employment with CCPN, Physician shall immediately deliver to CCPN sole custody and total, exclusive, and complete use of its medical records, premises, equipment, and supplies. In addition, Physician shall immediately surrender and refrain from using any user name and password with respect to accessing CCPN's health information system.

(d)     If Physician terminates his/her employment with CCPN without providing CCPN with the required prior written notice, Physician shall pay liquidated damages to CCPN in an amount equal to a prorated amount of the Physician's base compensation based upon the actual number of days of notice that Physician failed to provide. Physician authorizes CCPN to withhold from any amounts owing to Physician, whether in the form of salary, incentive compensation, and reimbursement or otherwise, the full amount of any liquidated damages owed in accordance with this paragraph.

(e)     In the event that CCPN terminates Physician without cause, at CCPN's sole election, CCPN may permit the Physician to continue working pursuant to this Agreement until the termination effective date specified by CCPN, or CCPN may require, at any time during the period between CCPN's provision to Physician of its termination notice and the effective date of termination, that Physician immediately cease performing services hereunder. If CCPN requires Physician to cease providing services prior to the termination date in accordance with this Agreement, CCPN shall pay Physician

the prorated amount of Physician's base compensation based upon the number of days remaining until the termination effective date, such amount to serve as Physician's final salary and bonus payment (subject to payment of accrued vacation as set forth above), and shall continue to provide medical and dental benefits until the termination date.

3.4    Suspension; Opportunity to Cure. If CCPN believes that the Physician has committed a material violation of this Agreement, CCPN may, as an alternative to termination and in its sole discretion, by written notice to the Physician describing the material violation, suspend the Physician without compensation, except to the extent otherwise required by the terms of a particular research grant, for a specified period of time or provide the Physician with a specified period of time in which to cure the violation. These alternatives to termination are within the sole discretion of CCPN and are not entitlements of the Physician. The fact that CCPN may implement one or both of these alternatives on one or more occasions does not create the basis for the Physician to claim that the Physician has a right to either or both alternatives.

3.5    Resignation from Facility Medical Staffs. Immediately upon the termination or expiration of this Agreement for any reason, the Physician will resign from the medical staff of each Assigned Hospital; and the Physician irrevocably appoints the CCPN President as the Physician's attorneys-in-fact to submit such resignation on the Physician's behalf if the Physician fails to do so within seventy-two (72) hours after such termination. The Physician hereby holds CCPN harmless and releases it, its designees and each Assigned Hospital and their respective boards of trustees and officers from any liability therefor.   The Physician acknowledges and agrees that the resignation of medical staff privileges shall not be subject to any review, hearing or other due process rights under the Medical Staff Bylaws or other governing policies of any Assigned Hospital or by any court or otherwise, which review, hearing and rights (if any) the Physician hereby specifically waives. The Physician has the right to reapply for privileges in accordance with the Medical Staff Bylaws of the Assigned Hospital(s). Notwithstanding the foregoing, CCPN, in its sole discretion, shall have the right to determine whether it is in an Assigned Hospital's best interest to permit the Physician to remain a member of the medical staff of the Assigned Hospital following termination or expiration of this Agreement and, to that end, waive its right to enforce this Section 3.5 without affecting its rights under any other provision of this Agreement.

4.    Compensation and Benefits.  In consideration of the Physician's services provided pursuant to this Agreement, CCPN agrees to pay the Physician the base compensation, and provide certain employment benefits, as specified on Exhibit A.

5.    Space, Equipment, Supplies, Non-Physician Personnel.   CCPN shall provide, or arrange for the provision of, all of the space, equipment and supplies as are required, in the reasonable judgment of CCPN following consultation with the Physician, for the proper provision of services to be provided under this Agreement.  Such space, equipment and supplies shall be made available at the cost and expense of CCPN. CCPN shall provide, or arrange for the provision of, all non-physician personnel required, in the reasonable judgment of CCPN, for the proper provision of services to be provided under this Agreement.

CCPN may determine.   The services called for under this Agreement are personal to Physician. Accordingly, Physician may not assign this Agreement without written consent of CCPN.

15.12   Entire Agreement.   This Agreement, along with its Exhibits, represents the entire agreement between CCPN and the Physician and supersedes any previous agreements between CCPN (or any entity within Caritas Christi) and Physician relating to Physician's employment.

15.13   Survival.   The covenants contained in Sections 2.9, 3.3, 3.5, 6, 10, 11, 14, and 15 shall survive any termination or expiration of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date, as defined in Exhibit A.

CARITAS CHRISTI PHYSICIAN NETWORK

By _____

Michael Callum, M.D.
President

Date: _____

THE PHYSICIAN

By _____

Alexander Lipin, M.D.

## EXHIBIT A

| | | |
|---|---|---|
| 1 | Name and Address of Physician (the "Physician") | Alexander Lipin, M.D.<br>350 Revere Beach Blvd., Apt. #9-10P<br>Revere, MA 02151 |
| 2 | Initial Term | Two (2) years |
| 3 | Effective Date | January 1, 2010 |
| 4 | Practice Location | Methuen, MA |
| 5 | Assigned Hospital(s) | Holy Family Hospital |
| 6 | Allocation of Professional Time | Clinical Services   100%<br>Total:   100% |
| 7 | Base Compensation | For the initial two (2) years, Physician shall receive an annual base compensation of $175,000 which will be paid out on a bi-weekly basis ("Base Compensation"). In addition, Physician shall receive the following compensation for rendering ECT consultations or treatments per day: $200 for one patient, $250 for two patients, $300 for three patients, and an additional $50 for each additional patient.<br><br>For any renewal term(s) following the initial (2) years, base compensation will be determined by mutual agreement of the parties, consistent with fair market value for Physician's specialty. |
| | Additional Compensation | Physician will receive the following additional compensation: Two Hundred Dollars ($200) for each overnight call (as defined by the Assigned Hospital's policies in effect at the time the work is performed) and Eight Hundred Dollars ($800) for weekend or holiday rounds (as defined by the Assigned Hospital's policies in effect at the time the work is performed). |
| 8 | Physician's Specialty | Psychiatry |
| 9 | Vacation | Physician shall be eligible for vacation pursuant to CCPN's Human Resources policies and procedures applicable to all employed physicians. |

13

| 10 | Health and Dental Insurance | Caritas Christi Health Care Plan |
|----|------------------------------|--------------------------------|
| 11 | Life Insurance | Caritas Christi Health Care Plan |
| 12 | Disability | Caritas Christi Health Care Plan |
| 13 | Retirement Plan | Caritas Christi Health Care Plan |
| 14 | Medical Malpractice Insurance | CCPN shall maintain in full force and effect during the term of this Agreement professional malpractice insurance coverage for Physician with minimum limits of $2,000,000 per incident and $6,000,000 in the aggregate, or such higher limits as CCPN may from time to time provide for all employed physicians or for physicians in Physician's specialty. Physician understands and agrees that CCPN's malpractice policy is a claims-made policy. Physician shall receive tail coverage at the end of the third year following the Effective Date. |
| 15 | Continuing Medical Education ("CME") | Physician shall be eligible for time away from the Hospital for CME and CME-related expense reimbursement pursuant to CCPN's Human Resources policies and procedures applicable to all employed physicians. |
| 16 | Professional Expenses | Physician shall be eligible for professional expense reimbursement pursuant to CCPN's Human Resources policies and procedures applicable to all employed physicians. |
| 17 | Sick Leave | Physician shall be eligible for sick leave pursuant to CCPN's Human Resources policies and procedures applicable to all employed physicians. |

14

<u>Exhibit B</u>
<u>CARITAS CHRISTI CODE OF CONDUCT</u>

# EXHIBIT B

# FMLASource®

455 N. Cityfront Plaza Drive, 13th Floor
Chicago, IL 60611-5322
Phone: 877-FMLA-MOO
Fax: 877-309-0218
www.FMLAsource.com



Attn: Steward Health Care System

Leave Request # 1088054

3/4/2015

Alexander Lipin
350 Revere Beach Blvd 9-10P
Revere, MA  02151

Dear Alexander,

This letter confirms decisions made regarding your recent request(s) for leave from your position at Steward Health Care System for your own serious health condition. The following are the most recent decisions for your current leave request and are based on certification completed by your healthcare provider:

| On Continuous Leave | Beginning on 1/27/15 | Ending on 3/2/2015 |
| --- | --- | --- |
| Decision = Approved | Decision Reason = End of Leave Unconfirmed | |
| Estimated frequency of absence: On a continuous basis | | |
| [Revised Begin Date] | | |
| Applicable Leave Plan(s): FMLA | | |

## What You Need To Know

Based on the continuous and/or reduced leave(s) approved above, the anticipated amount of entitlement used for this leave will be: 5.00 weeks (200.00 hours) for this request.

Family Medical Leave (or FMLA) allows eligible, approved employees up to a total of 12 weeks of unpaid leave in a 1-year period for certain family and medical reasons. If your leave is approved, time missed for the reason listed above will count against this entitlement.

If your leave is supplemented by a pay replacement benefit (for example, short-term disability, worker's compensation and/or paid time off) that benefit will run concurrently with your leave.

## What You Need To Do

Provide a fitness-for-duty certification upon your return from continuous or reduced schedule leave for your own health condition. In order to be restored to your job, you must present to your employer certification from your doctor stating that you are fit to return to work.

Notify FMLASource if your leave changes.
If, for any reason, your condition or status changes significantly while on FMLA leave, please notify FMLASource immediately.

Should you have any questions, please contact FMLASource by sending an email to
FMLACenter@FMLASource.com or call us toll free at 877-FMLA-MOO. Please reference your leave
request number # 1088054 when you contact us. You may also find information and review your leave
status on our website at www.FMLAsource.com. To access your record, please visit our website and
create a username and password. You must have your employee ID number and the postal code
(02151) on file with your employer to register. We are working to provide you with excellent service
during your leave.

Best Regards,

FMLASource

cc: General HR Inbox,

# EXHIBIT C



**MEDICAL
GROUP**

**SENT VIA CERTIFIED MAIL AND US MAIL**

February 23, 2015

Alexander Lipin, MD
350 Revere Beach Blvd 9-10P
Revere, MA 02151

Re:     That Physician Employment Agreement, as previously amended, supplemented, or otherwise modified (the "Employment Agreement"), dated January 1, 2010, by and between Steward Medical Group, Inc. ("SMG") and Alexander Lipin, M.D.
(the "Physician").

Dear Dr. Lipin:

I am writing to notify you that SMG hereby exercises its right to terminate your Employment Agreement referenced above pursuant to Section 3.2(c) thereof.   Accordingly, the Employment Agreement shall terminate and be null and void effective as of May 24, 2015.

In accordance with your Employment Agreement, SMG hereby exercises its authority to cause you to discontinue the provision of services prior to the termination date, effective February 23, 2015. SMG will pay you the prorated amount of your base compensation based upon the number of days remaining until the termination effective date, such amount to serve as your final salary and bonus payment (subject to payment of accrued vacation). Additionally, SMG will continue to provide medical and dental benefits until the termination date.

Kindly complete all medical record documentation and associated billing by end of day on February 23, 2015.

If you have any question please feel free to contact Danielle Mulholland, Sr. Director of Human Resources at (617) 419-4873.

Sincerely,

George Clairmont, MD
President, Steward Medical Group, Inc.

CC:     Human Resources, Dominique Morgan-Solomon, Mark Scheyer

Bcc:    Dr. Lipin (By Email Only)

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
| --- | --- | --- |

PLAINTIFF(S): Dr. Alexander Lipin

ADDRESS: 350 Revere Beach Blvd., 9-10P

Revere, MA 02151

ATTORNEY: Kavita M. Goyal

ADDRESS: Rosen Law Office, P.C.

204 Andover Street, Suite 402

Andover, MA 01810

BBO: 654013

COUNTY: *Suffolk*

DEFENDANT(S): Steward Healthcare System, LLC, Steward Medical Group, Inc.,

Holy Family Hospital

ADDRESS: 500 Boylston Street, Boston, MA 02116

Holy Family Hospital is located at 70 East Street, Methuen, MA.

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO.<br>B22 | TYPE OF ACTION (specify)<br>Employment Discrimination | TRACK<br>F | HAS A JURY CLAIM BEEN MADE?<br>☒ YES ☐ NO |
| --- | --- | --- | --- |

*If "Other" please describe: _____

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........................................................................ $ _____
2. Total doctor expenses .......................................................................... $ _____
3. Total chiropractic expenses ................................................................. $ _____
4. Total physical therapy expenses .......................................................... $ _____
5. Total other expenses (describe below) ................................................ $ _____
                                       Subtotal (A): $ _____

B. Documented lost wages and compensation to date .................................. $ _____
C. Documented property damages to dated ................................................. $ _____
D. Reasonably anticipated future medical and hospital expenses ................. $ _____
E. Reasonably anticipated lost wages ......................................................... $ _____
F. Other documented items of damages (describe below) ............................ $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Plaintiff has suffered lost wages and distress damages as a result of Defendants' unlawful termination of his employment, which results in damages of at least $170,000.

TOTAL (A-F):$ *min. of* $170,000

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X _____  Date: 9/15/16

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____  Date: 9/15/16

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA, etc. | (A) |

### CN Contract/Business Cases

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c.231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

### PA Civil Actions Involving Incarcerated Party †

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

### TR Torts

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical / Wrongful Death | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death, G.L. c.229 §2A | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (A) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

### RP Real Property

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

### MC Miscellaneous Civil Actions

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10 §28 | (X) |

### AB Abuse/Harassment Prevention

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E(X) | |

### AA Administrative Civil Actions

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c.249 §4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G. L. c. 93 §9 | (A) |
| E07 Mass Antitrust Act, G. L. c. 93 §8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149 §§29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12 §11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123 §9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c.265 §56 | (X) |
| E95 Forfeiture, G.L. c.94C §47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231 §60B | (F) |
| Z02 Appeal Bond Denial | (X) |

### SO Sex Offender Review

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A §12 | (X) |
| E14 SDP Petition, G.L. c. 123A §9(b) | (X) |

### RC Restricted Civil Actions

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c.6 §178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112 §12S | (X) |

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

EXAMPLE:

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** - The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or pro se party.

**DUTY OF THE DEFENDANT** - If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.