# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

DR. ALEXANDER LIPIN,

    Plaintiff,

v.

STEWARD HEALTH CARE SYSTEM LLC,
STEWARD MEDICAL GROUP, INC., and
HOLY FAMILY HOSPITAL

    Defendants.

CIVIL ACTION NO.
1:16-CV-12256

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS

Pursuant to Fed. R. Civ. P. 56, Local Rule 56.1 and the Court's November 16, 2016

Standing Order Regarding Briefing of Summary Judgment Motions (Dkt. 6-2), Defendants

Steward Health Care System LLC ("Steward"), Steward Medical Group, Inc. ("SMG"), and Holy

Family Hospital ("Holy Family" or the "Hospital") (collectively, "Defendants") submit the

following statement of undisputed material facts as to which they contend there is no genuine issue

to be tried.[1]

---

[1] This Statement of Undisputed Material Facts references (1) excerpts of the deposition transcripts of John Alexander, George Clairmont, Sheela Hedge-Batlivala, Alexander Lipin, and Danielle Mulholland; (2) exhibits to those depositions; (3) a declaration from Danielle Mulholland; and (4) SMG's Supplemental Response to Interrogatory Numbers 6 and 12 ("Supp. Int. Rsp."). All of the foregoing materials are identified in the accompanying affidavit of Barry J. Miller, and included in the accompanying Appendix to Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment on All Counts. In this Statement of Undisputed Material Facts, references to transcripts will be in the form "[Last name] Tr. [page #]." References to deposition exhibits will be in the form "[Last name] Ex. [#]." References to the Declaration of Danielle Mulholland and exhibits thereto will be in the form "Mulholland Dec. ¶ [#], Ex. [#]."

**I.     Defendants' Commitment to Nondiscrimination, Equal Employment Opportunity and Workplace Civility**

1.     Holy Family, which has two locations in Haverhill and Methuen, Massachusetts, is a member of Steward, the largest community care organization in Massachusetts.  (Mulholland Tr. 46:5-17; Hedge-Batlivala Tr. 15:20-16:3; Mulholland Dec., ¶ 3).

**RESPONSE:**


2.     SMG is a multispecialty practice organization that employs physicians who work within Steward's medical facilities, including physicians who work at Holy Family.  (Mulholland Dec. ¶ 4; Clairmont Tr. 13:20-14:7, 21:14-16).

**RESPONSE:**


3.     Holy Family is an equal opportunity employer, does not tolerate discrimination in the workplace, and requires all persons who work at the Hospital to adhere to its Equal Employment Opportunity policy, which prohibits discrimination based upon disability and other protected categories.  (Mulholland Dec. ¶ 5, Ex. A).

**RESPONSE:**


4.     Steward maintains a Code of Conduct, which contains workplace civility rules that all persons who work at Holy Family (and other locations within Steward) are required to follow. (Mulholland Dec. ¶ 6, Ex. B, p. SMG000639).  Those rules require all persons who work at Holy

Family to treat their coworkers with respect, patience and courtesy; and prohibit intimidating, abusive and disruptive behavior.  (*Id.*).

**RESPONSE:**


II.     **Lipin's Employment with SMG**

5.     Lipin worked as a psychiatrist at Holy Family's Methuen location from about May 2007 through early 2015.  (Lipin Tr. 92:15-20, 106:20-107:4, 107:16-18; Hedge-Batlivala Tr. 18:7-20; Mulholland Dec. ¶ 7).

**RESPONSE:**


6.     From approximately May 2007 until his termination in 2015, Lipin worked in a full-time position at Holy Family, and was expected to provide 40 hours of clinical service to the Hospital per week.  (Lipin Tr. 92:25-93:2, 93:20-95:8; Complaint ¶ 13; Mulholland Dec. ¶ 7).

**RESPONSE:**


7.     Throughout Lipin's work at Holy Family, he was assigned to work in the Hospital's St. Michael's unit or its St. Dyphnis unit, which are locked in-patient psychiatric wards, and together constitute Holy Family's acute psychiatric care facility at its Methuen location.  (Lipin Tr. 106:20-108:7, 109:3-11, 120:1-13, 121:19-21, 122:4-8, 123:10-13; Hedge-Batlivala Tr. 18:7-20, 19:6-7, 19:12-14).

**RESPONSE:**


8.     From at least 2010 through May 24, 2015, Lipin administratively reported to Dr. Sheela Hedge-Batlivala, the Chair of the Hospital's Center for Behavioral Health at the time

("Hedge-Batlivala"). (Lipin Tr. 133:12-134:13, 134:23-135:7, 137:21-138:2; Hedge-Batlivala Tr. 21:8-11, 21:18-23, 23:15-18, 27:24-28:19).

**RESPONSE:**

9.      From at least September 2013 through May 24, 2015, Hedge-Batlivala reported to Dr. John Alexander, Holy Family's Vice President of Medical Affairs at the time ("Alexander"). (Alexander Tr. 22:1-5; Hedge-Batlivala Tr. 21:8-15, 23:15-18).

**RESPONSE:**

10.      Lipin's employer was SMG, and his work at Holy Family was governed by an agreement between himself and SMG ("Employment Contract"). (Lipin Tr. 153:15-16, 157:6-7, 354:20-23; Mulholland Tr. 86:7-13; Mulholland Ex. 3; Clairmont Tr. 39:15-18, 41:9-10; Complaint ¶ 11, Ex. A; *see also* Mulholland Tr. 194:15-20).

**RESPONSE:**

11.      Lipin's Employment Contract contained termination provisions, which allowed SMG to terminate the contract (1) with Cause, effective immediately; or (2) without cause, which required 90 days' notice or pay in lieu of notice. (Mulholland Tr. 86:7-13; Mulholland Ex. 3 at pp. 4-7; Complaint ¶ 11, Ex. A at pp. 4-7).

**RESPONSE:**

12.     Since approximately 2007 or 2008 (and through the present day), Lipin also has worked as a full-time psychiatrist at Anna Jacques Hospital ("Anna Jacques").  (Lipin Tr. 30:18-31:1, 32:8-14, 43:19-44:3, 53:5-10).

**RESPONSE:**


### III.   Lipin's Performance Failed to Meet SMG's Expectations

13.     From at least 2008 through 2015, Hospital staff, patients or people who performed intake for the Hospital made complaints regarding Lipin, which included allegations that Lipin was loud, abusive and/or impulsive.  (Hedge-Batlivala Tr. 27:11-16, 37:18-38:3, 38:20-22, 108:5-20, 112:8-9; Alexander Tr. 92:18-23; *see also* Alexander Tr. 95:5-7; Hedge-Batlivala Tr. 109:23-110:10).

**RESPONSE:**


14.     Lipin admits that between July 2013 and January 2015, there were ten instances in which issues were raised in the workplace that had some connection to him.  (Lipin Tr. 406:4-14; *see* Lipin Tr. 205:1-14, 396:21-398:7, 399:1-400:17).

**RESPONSE:**


### A.   In 2013 and 2014, The Hospital Received Multiple Complaints Regarding Lipin's Conduct in the Workplace

15.     In July 2013, an Access Manager at a Steward facility in Norwood, Massachusetts accused Lipin of being rude or abrasive in his interactions with her.  (Lipin Tr. 195:16-24, 196:18-24, 197:12-17,  202:10-14, 205:1-14, 213:5-10, 256:14-257:1; Lipin Ex. 8).

**RESPONSE:**

16.     On February 5, 2014, a Steward Access Manager reported to Cornelia Walsh, the Hospital's Behavioral Health Center's Patient Care Director at its Methuen location, that, among other things, Lipin was consistently denying admission to patients in the Holy Family emergency room on the weekends.  (Lipin Tr. 205:15-16, 205:25-206:14, 206:24-207:6; Lipin Ex. 9; Mulholland Dec. ¶ 8, Ex. C).

**RESPONSE:**


17.     On June 5, 2014, Andrea Costello, a Registered Nurse who worked at the Hospital, sent an email to Walsh, which stated, among other things, (1) "It appears very clear that Dr. Lipin has an issue with me on a personal level as evidenced again by his behavior toward me this evening;" and (2) that Lipin had a disagreement with Costello, refused to prescribe medication for a patient, and hung up on her.  (Lipin Tr. 260:22-24, 261:19-23, 262:4-11, 263:1-10; Lipin Ex. 13; Mulholland Dec. ¶ 9, Ex. D).

**RESPONSE:**


18.      Walsh forwarded Costello's June 5, 2014 email to Hedge-Batlivala, and stated, "Andrea also had the issue with him a couple nights ago," and "I also had complaints from a family about him."  (Lipin Tr. 260:22-24, 263:11-264:4; Lipin Ex. 13; Mulholland Dec. ¶ 9, Ex. D).

**RESPONSE:**


19.     On October 12, 2014, Jeanne Ford, a Steward Access Clinician, sent an email to Hedge-Batlivala and Walsh titled "Abusive Encounter with Dr. Lipin," in which Ford stated that she was "writing this email to inform all of a disturbing incident which occurred this evening while presenting 3 Holy Family Emergency Room patients to Dr. Lipin for admission."  (Lipin Tr.

282:12-283:16; Lipin Ex. 15; Mulholland Dec. ¶ 10, Ex. E).

**RESPONSE:**


20.     Ford's October 12, 2014 email further stated:

Dr. Lipin first spoke to my colleague Allison when she presented 2 patients to him. I subsequently presented a patient from the ER to him for admission.  Throughout both presentations he was insulting to both myself and Allison, raising his voice and treating us in a very disrespectful manner. . . . he repeatedly shouted . . . and stated that I was 'awful' . . . and then hung up on me. . . . This is not the first time [sic] which an incident like this has occurred involving Dr. Lipin.  However this particular episode was found by both myself and Allison to be the most offensive and unprofessional experiences [sic] that either of us have endured as employees of Steward Healthcare.

(Lipin Tr. 283:17-284:5; Lipin Ex. 15; Mulholland Dec. ¶ 10, Ex. E).

**RESPONSE:**


21.     On or about October 15, 2014, Holy Family received a letter from Dr. Himal Mitra, a psychologist based in Brookline, Massachusetts ("Mitra"), addressed to Joseph Roach, Holy Family's President and CEO at the time, in which Mitra stated that during a phone call regarding a patient of Mitra's who was receiving in-patient care at Holy Family, Lipin was "rude, haughty, poorly informed, inaccessible to reasoned clinical conversation, [and] a bully."  (Lipin Tr. 285:22-286:15, 289:18-22; Lipin Ex. 16; Mulholland Dec. ¶ 11, Ex. F).

**RESPONSE:**


22.     Mitra's October 15, 2014 letter further stated that "[i]n some decades of professional life, I have never had a cause to regret remarks I was provoked to make to a putative colleague.  Nor have I ever been so outraged as to warrant writing such a letter.  I've had no previous experience with Holy Family's psychiatric unit, and I'm sorry to say that I expect to have

no further experience.   The patient's family, care team and I are trying to arrange transfer elsewhere."   (Lipin Tr. 291:23-292:15; Lipin Ex. 16; Mulholland Dec. ¶ 11, Ex. F).

**RESPONSE:**


23.     On or about October 20, 2014, Alexander and Kent Boynton, the Hospital's Service Line Director, met with Lipin to discuss Ford's October 12, 2014 complaint and Mitra's October 15, 2014 letter.   (Lipin Tr. 295:20-24; Alexander Tr. 82:20-84:21, 88:21-89:1).

**RESPONSE:**


24.     Later that day (October 20, 2014), Alexander sent Lipin a letter that stated in part:

> This letter is to acknowledge that we discussed the two recent complaints regarding your communication with other health care providers – The Access Team and Dr. Himal Mitra.  I have expressed to you my concern that these complaints describe disruptive behavior, and you have assured me that the tone and content of future communications will be professional. . . .

(Lipin Tr. 294:2-24, 295:12-19; Lipin Ex. 17; Alexander Tr. 85:22-86:9; *see also* Alexander Tr. 84:24-85:5).

**RESPONSE:**


25.     On November 22, 2014, two clinicians from Holy Family's psychiatric admissions team reported, among other things, that (1) Lipin had used aggressive and insulting language toward them when they contacted him to process two emergency department patients for admission; (2) Lipin's demeanor was hostile; (3) Lipin's behavior made both clinicians uncomfortable; (4) Lipin displayed very little concern regarding the care of the patients in the Holy Family emergency room; and (5) Lipin laughed at the symptoms of a patient receiving care in the

emergency room as not serious.  (Mulholland Dec. ¶ 12, Ex. G; Lipin Tr. 365:21-24, 368:2-22, 369:6-11, 369:14-370:24, 371:22-372:11; Lipin Ex. 25).

**RESPONSE:**


> **B.  On November 16, 2014, the Hospital Received a Report that Lipin Gave a Patient's Demographic Information to the Methuen Police Department**

26.    On November 16, 2014, the Hospital received a report that Lipin had called the Methuen police department, given a patient's demographic information to the department, and requested that the department run a search to determine whether the patient had any outstanding criminal warrants.  (Mulholland Tr. 182:6-18; Mulholland Ex. 19; Lipin Tr. 309:5-15, 313:19-314:7; Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H).

**RESPONSE:**


27.    The report further indicated that the police department refused to run the search, that Lipin was not satisfied with the refusal, and that Lipin thereafter got into an argument with the police captain.  (Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H).

**RESPONSE:**


28.    The report also indicated that later on November 16, (1) the police captain sent an officer to the hospital; (2) Lipin requested that the officer on site check to see if the patient had any outstanding warrants, again providing the patient's name; and (3) the officer refused to do so, telling Lipin that he was not permitted to request such information from the department

(hereinafter, the facts described in Paragraphs 26-28 are referred to as the "November 16 Incident"). (Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H).

**RESPONSE:**


29.     Holy Family documented the November 16 Incident in its RL Solutions system, which the Hospital uses to record risk and/or compliance concerns, as well as patient care issues. (Mulholland Tr. 48:9-13, 49:3-50:6, 179:12-180:3, 184:6-18; Mulholland Ex. 19).

**RESPONSE:**


30.     The report of the November 16 Incident precipitated an investigation as to whether Lipin's informing a third party of an individual's status as a psychiatric patient at the Hospital violated the Health Insurance Privacy and Accountability Act ("HIPAA"). (Lipin Tr. 309:5-15, 311:12-312:4, 313:19-314:23, 481:17-21; Clairmont Tr. 40:19-23; Mulholland Tr. 129:6-130:8; *see* Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H).

**RESPONSE:**


      **C.**     **Lipin Obstructed the Hospital's Compliance Investigation
of the November 16 Incident**

31.     The protection of patient information is of the utmost importance to the Hospital and SMG, and any HIPAA breach is a serious and significant event for the Hospital and SMG. (Clairmont Tr. 47:19-48:8; Mulholland Dec. ¶ 14).

**RESPONSE:**

32.     Shortly after Holy Family was notified of the November 16 Incident, Elizabeth Brown, the Hospital's Compliance and Privacy Officer at the time, undertook to investigate the November 16 Incident to determine whether Lipin had breached his compliance obligations and/or Hospital policy.  (Lipin Tr. 307:16-308:5, 309:5-15, 311:21-312:4, 319:23-320:3, 481:17-482:2; Mulholland Tr. 129:21-130:5; Clairmont Tr. 47:13-15; *see* Lipin Tr. 315:10-316:7; Lipin Ex. 19).

**RESPONSE:**


33.     On Thursday, November 20, 2014, Hedge-Batlivala telephoned and emailed Lipin to request that he schedule a meeting with Alexander and Brown for the following day (Friday, November 21) between 7:00 and 10:00 a.m., stating "It is very important that you meet with them tomorrow."  (Lipin Tr. 315:10-316:7, 318:2-9; Lipin Ex. 19; Hedge-Batlivala Tr. 101:13-19).

**RESPONSE:**


34.     Lipin responded to Hedge-Batlivala's email, stated that he could not meet during that time, and proposed a meeting between 2:00 and 3:00 p.m.  (Lipin Tr. 316:8-13, 318:11-319:9; Lipin Exs. 19-20).  Hedge-Batlivala responded, "The time offered is between 7am - 10 am.  Please let Dr. Alexander know what time you can meet within that time frame."  (Lipin Tr. 318:11-319:14; Lipin Ex. 20).

**RESPONSE:**


35.     Later that day (November 20), Lipin emailed Alexander, stating that he was not available during Hedge-Batlivala's proposed time frame, but could meet around 2:00 or 3:00 p.m. (Lipin Tr. 320:16-322:8; Lipin Ex. 21).  Although Alexander told Lipin in subsequent emails that (1) he (Alexander) was unavailable after 11:00 a.m.; (2) the meeting could not wait; and (3) he and

Brown needed to meet with him so that Defendants could understand whether there had been a breach of Protected Health Information, Lipin did not agree to meet during the proposed time frame, and did not meet with Alexander on November 21.  (Lipin Tr. 322:15-325:15, 330:9-12; Lipin Ex. 21; *see also* Lipin Tr. 331:2-24; Lipin Ex. 22).

**RESPONSE:**


36.     On November 24, 2014, Hedge-Batlivala emailed Lipin again, stating that Alexander and Brown had not heard from him and wanted to meet with him.  (Lipin Tr. 331:2-24; Lipin Ex. 22).

**RESPONSE:**


37.     Lipin, Brown and Alexander had a meeting on or around November 25, the purpose of which was to interview Lipin as part of Brown's investigation of the November 16 Incident ("November 25 Meeting").  (Lipin Tr. 314:8-23, 334:7-17; Alexander Tr. 89:2-13, 90:5-7).

**RESPONSE:**


38.     At Alexander's request, Jean Sebourn, the Hospital's Quality Director and Risk Manager, also attended the November 25 Meeting.  (Lipin Tr. 334:18-24, 335:5-18; Alexander Tr. 91:3-7).

**RESPONSE:**


39.     Toward the beginning of the November 25 Meeting, Lipin asked Alexander that he be permitted to make an audio recording.  (Lipin Tr. 336:4-6, 337:11-15, 344:6-8; Alexander 90:18-19, 101:14-102:8; Alexander Ex. 5).  Although Alexander denied Lipin's request, Lipin

nevertheless recorded a portion of the meeting on his cell phone, until Brown noticed that he was doing so and Alexander again told him to stop.  (Lipin Tr. 336:4-8, 337:11-15, 338:13-18, 339:5-340:2; Alexander Tr. 90:17-22, 101:14-102:8; Alexander Ex. 5).

**RESPONSE:**


40.     Alexander felt that Lipin was at times uncooperative, aggressive, rude and disrespectful during the November 25 Meeting.  (Alexander Tr. 90:8-91:3, 91:11, 101:14-102:8; Alexander Ex. 5).  He also felt that whenever Lipin asked a question at the meeting, and Brown or Sebourn tried to answer it, Lipin would interrupt them.  (Alexander Tr. 91:10-14).

**RESPONSE:**


41.     Before Brown could interview Lipin, the meeting became heated, and based upon Lipin's behavior, Alexander ended the November 25 Meeting and told Lipin to leave his office.  (Alexander Tr. 90:8-16, 91:10-24, 101:14-102:8;  Alexander Ex. 5;  Lipin Tr. 340:23-341:7, 344:17-24).

**RESPONSE:**


42.     Before the November 25 Meeting ended, Alexander told Lipin that he would petition to review Lipin's contract and wanted to fire Lipin.  (Lipin Tr. 90:1-6, 343:21-344:16, 348:20-349:7, 350:11-351:5; Lipin Ex. 24).

**RESPONSE:**


43.     On or about November 30, 2014, Lipin sent an email to Ralph de la Torre, Steward's Chief Executive Officer; Joseph Roach, then President of Holy Family; and Dr. George

Clairmont, then SMG's Chief of Primary Care and Medical Specialties, and the individual who ultimately was responsible for deciding whether Lipin would be terminated ("Clairmont").  (Lipin Tr. 86:2-20, 88:2-5, 88:25-89:3; Lipin Ex. 6; Clairmont Tr. 14:16-23, 18:23-19:3, 21:1-5, 83:1-3; Mulholland Tr. 64:3-14, 67:14-24; *see* Clairmont Tr. 40:19-42:2, 47:16-48:16, 51:2-15, 51:22-24).

**RESPONSE:**


44.      Lipin's November 30, 2014 email stated that during a meeting between Lipin, Alexander and Sebourn, Alexander (1) twice said "I am throwing you away from my office! Get out!"; (2) said that he would petition to review Lipin's Employment Contract and would like to fire him; and (3) suggested to Lipin that he invite an attorney to their next meeting.  (Lipin Tr. 86:2-20, 88:2-5, 88:25-89:3, 84:14-19; Lipin Ex. 6; Clairmont Tr. 21:1-5, 83:1-3).  At the time Lipin wrote the email, he "absolutely" believed everything that he had written to be true.  (Lipin Tr. 89:10-13).

**RESPONSE:**


## IV.   In Late November 2014, Alexander Recommended that SMG Terminate Lipin's Employment Contract

45.      Alexander was upset after the November 25 Meeting because he found that Lipin had been very disrespectful to people who did not deserve to be treated that way.  (Alexander Tr. 92:15-23).

**RESPONSE:**


46.      Shortly thereafter, in late November 2014, Alexander recommended to Mulholland that SMG terminate Lipin's Employment Contract.  (Alexander Tr. 93:3-94:13, 98:9-17, 112:4-6,

159:22-160:1;  Mulholland  Tr.  131:9-18,  132:1-10;  Mulholland  Ex.  7,  p.  SMG000268).

Alexander's recommendation was based on what he believed to be a pattern of bad behavior,

including (1) Lipin's conduct during the November 25 meeting; (2) Lipin's unwillingness to

participate in Brown's investigation of the November 16 Incident; and (3) a pattern of what

Alexander believed to be disruptive behavior by Lipin.  (Alexander Tr. 94:6-13, 94:24-95:7, 98:9-

17, 101:14-102:8, 159:22-160:7; Alexander Ex. 5).

**RESPONSE:**


47.    On November 25, 2014, Danielle Mulholland, then a Director of Human Resources

for SMG, sent an email to Clairmont titled "Documentation - Dr. Alexander Lipin," in which she

stated, "Attached is documentation that John Alexander sent to me . . . . John is looking to term

this physician….either "'or cause' or 'without cause.'"  (Mulholland Tr. 18:22-19:10, 28:4-10,

29:18-30:13, 131:9-18, 132:1-10; Mulholland Ex. 7, p. SMG000268).

**RESPONSE:**


48.    In about November 2014, Clairmont – who had been a physician since 1982 and

had spent more than 16 years working as a primary care physician – was transitioning from his

role as SMG's Chief of Primary Care and Medical Specialties to a new role as the President of

SMG (which was effective January 1, 2015).  (Clairmont Tr. 12:5-19, 13:6-9, 14:11-23, 41:15-

42:4, 15:10-16:1, 18:23-19:3, 20:1-9, 41:1-42:2).

**RESPONSE:**


49.    Clairmont was aware of Alexander's recommendation in November, but decided to

wait to decide whether he would terminate Lipin until Brown concluded her investigation, so that

he could understand whether Lipin had violated HIPAA.  (Clairmont Tr. 51:2-15, 64:2-9, 68:13-18, 71:7-10; *see* Mulholland Tr. 96:9-97:8, 131:9-18, 132:1-10; Mulholland Ex. 7).

**RESPONSE:**

50.     If Brown's investigation determined that Lipin had violated HIPAA, Clairmont would terminate Lipin's employment.  (Clairmont Tr. 47:20-48:16; Mulholland Tr. 131:9-18, 132:1-10; Mulholland Ex. 7).

**RESPONSE:**

**V.     In Late December 2014, Lipin Gave a Statement in Connection with the Hospital's Compliance Investigation of the November 16 Incident**

51.     On or about December 10, 2014, Clairmont and Mulholland met with Lipin, in an effort to get him to participate in Brown's investigation ("December 10 Meeting").  (Lipin Tr. 345:1-346:4, 348:12-17, 351:13-352:1; Mulholland Tr. 71:11-72:2, 135:11-136:2, 136:18-21; Clairmont Tr. 43:1-9, 45:21-24).

**RESPONSE:**

52.     During the December 10 Meeting, Clairmont explained to Lipin that SMG had to follow a regulatory process for investigating potential HIPAA violations, and that such a process was underway.  (Lipin Tr. 357:4-16, 358:18-20, 482:17-483:7, 483:24-484:5; Clairmont Tr. 43:14-23, 63:12-17).  Clairmont asked Lipin to comply with the process, and Lipin agreed to do so. (Lipin Tr. 358:18-22; Mulholland Tr. 139:10-17; Clairmont Tr. 46:6-9).

**RESPONSE:**

53.     In approximately late December 2014, Brown, Alexander and Mulholland met with

Lipin at Holy Family, in an effort to continue Brown's investigation of the November 16 Incident

("Late December Meeting"). (Lipin Tr. 359:23-360:6, 361:3-16, 362:5-11; Mulholland Tr. 139:18-

19, 139:24-140:10).

**RESPONSE:**


54.     At the Late December Meeting, Lipin made a statement regarding his alleged

HIPAA violation, and Brown asked Lipin some questions regarding the factual circumstances

leading to the alleged violation.  (Lipin Tr. 362:12-363:20).  Brown also told Lipin that she would

investigate the situation, and did not state that she had reached a conclusion at the meeting.  (Lipin

Tr. 363:2-5, 364:24-365:2).

**RESPONSE:**


**VI.     On January 16, 2015, Brown Reported that She Had Concluded That Plaintiff
         Violated HIPAA and Was Dishonest During the Compliance Investigation**

55.     On January 16, 2015, Brown reported to Alexander and Mulholland via email that

she had concluded her investigation of the November 16 Incident.  (Mulholland Tr. 147:1-10;

Clairmont Tr. 55:4-10, 64:10-16, 86:2-7; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H).

**RESPONSE:**


56.      Brown's January 16, 2015 email stated that the investigation had determined that

Lipin had disclosed patient information to the Methuen police department in violation of HIPAA

and Holy Family policy.  (Clairmont Tr. 55:4-10, 64:10-16, 86:2-7; Clairmont Ex. 2; Mulholland

Dec. ¶ 13, Ex. H, p. SMG000257).

**RESPONSE:**


57.   Brown's January 16, 2015 email also stated that Lipin was "combative and

uncooperative" during his first interview, and that the interview was halted "due to this behavior."

(Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13, Ex. H, p. SMG000256).

**RESPONSE:**


58.   In addition, Brown's January 16, 2015 email stated that Lipin denied that he had

called the Methuen police department in his first interview, but admitted that he had made such a

call in his second interview.  (Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec.

¶ 13, Ex. H, p. SMG000256).

**RESPONSE:**


59.   Finally, Brown's January 16, 2015 email stated that Lipin had failed to show any

remorse for his actions.  (Clairmont Tr. 55:4-10, 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶

13, Ex. H, p. SMG000256).

**RESPONSE:**


60.   Brown's January 16, 2015 email was provided to Clairmont on January 16, 2015,

and he read the email that day.  (Clairmont Tr. 64:10-16; Clairmont Ex. 2; Mulholland Dec. ¶ 13,

Ex. H; Mulholland Tr. 147:11-148:1, 148:13-149:3).

**RESPONSE:**

**VII.**   **Shortly after January 16, 2015, Clairmont Decided to Terminate Lipin's Employment Contract with SMG**

61.     Shortly after receiving the results of Brown's HIPAA investigation on January 16, 2015, Clairmont, who had become the President of SMG on January 1, 2015, decided to terminate Lipin's Employment Contract.  (Clairmont Tr. 14:11-15, 58:12-59:4, 60:14-20, 64:10-16, 71:9-20, 85:1-4; Mulholland Tr. 148:13-149:3; *see also* Mulholland Tr. 64:3-14, 67:14-24).

**RESPONSE:**


62.     Clairmont decided to terminate Lipin's Employment Contract because of Brown's finding that Lipin had violated HIPAA, which Clairmont believed to be a serious offense and a significant breach of a patient's confidential information.  (Clairmont Tr. 51:22-24, 64:20-24, 58:12-23, 71:7-20; Mulholland Tr. 128:4-6; *see also* Clairmont Tr. 47:16-48:16).

**RESPONSE:**


63.     At the time, Lipin's situation was the only situation that Clairmont had handled in which a Hospital investigation had determined that an employee violated HIPAA.  (Clairmont Tr. 42:3-9, 47:20-48:5).

**RESPONSE:**


64.     In January, after Clairmont decided to terminate Lipin's Employment Contract, Clairmont and Mulholland discussed whether Lipin's termination would be classified as for Cause or not-for-Cause, ultimately deciding to seek advice from Steward's in-house counsel before

Clairmont determined how to classify the termination and communicated it to Lipin.  (Clairmont Tr. 56:13-58:5, 58:12-59:9, 66:3-9, 71:16-20, 87:21-88:5, 90:13-20; Mulholland Tr. 149:6-8).

**RESPONSE:**


65.     Clairmont first spoke with an individual from Steward's legal department about the termination of Lipin's Employment Contract at some point in January 2015 (after January 16). (Clairmont Tr. 61:1-8, 14-18).

**RESPONSE:**


66.     Steward's legal department took some time to review the situation and, as a result, Clairmont did not decide until mid-February 2015 that he would terminate Lipin's Employment Contract on a not-for-Cause basis.  (Clairmont Tr. 59:5-12, 59:24-60:9, 60:14-24, 63:8-11).

**RESPONSE:**


**VIII.   On January 26, 2015, Lipin Informed SMG for the First Time that He Had a Medical Condition for which He Needed to Take Time Off of Work**

67.     In late January or the beginning of February, after Clairmont decided to terminate Lipin's Employment Contract, Clairmont learned that Lipin had an acute medical condition called pneumonia.  (Clairmont Tr. 71:21-72:6, 81:22-82:8).  At the same time, Clairmont learned that Lipin had been out on a leave of absence for the condition.  (*Id.*).

**RESPONSE:**

68.     At his deposition, Clairmont testified as follows:

Q.     You said you recall learning at the end of January that Dr. Lipin was out sick; is that right?

A.     That is correct.  I said either at the end of January, beginning of February.  I don't have a specific date when it happened but I do recall, as I testified earlier, either in January or beginning of February.

Q.     And at that time you had already made the decision to terminate Dr. Lipin's employment, according to your testimony; correct?

A.     Correct.

(Clairmont Tr. 81:22-82:8).

**RESPONSE:**


69.     The evening of January 26, 2015, Lipin emailed Walsh, and stated that he had been seen by a physician in Holy Family's emergency department, had been diagnosed with pneumonia, and needed to take the rest of the week off.  (Lipin Tr. 435:4-437:5, 438:20-439:2, 443:8-11, 543:10-18; Lipin Ex. 31).

**RESPONSE:**


70.     Lipin's January 26, 2015 email to Walsh was the first report that Lipin made to Holy Family or SMG that he had a medical condition or needed time off due to a medical condition. (Lipin Tr. 442:12-443:4, 540:1-7, 541:6-16; Hedge-Batlivala Tr. 47:13-23).

**RESPONSE:**

**IX.     After Lipin Remained Out of Work for More Than a Week,
the Hospital Advised Him to Take a Leave of Absence**

71.     Lipin did not return to work after the conclusion of the week of January 26, 2015.

(Lipin Tr. 457:5-10).

**RESPONSE:**


72.     The following Thursday, February 5, 2015, Walsh emailed Lipin, "We are hoping

you are recovering well from your pneumonia, and that you will be back to work soon.  Do you

have an estimated date of return??"  (Lipin Tr. 544:4-7, 545:1-14; Lipin Ex. 34).

**RESPONSE:**


73.     Lipin responded to Walsh's February 5, 2015 email and stated that he had

"convinced" his primary care physician to "let [him] start working in a week," and attached a letter

from his physician dated February 4, 2015 ("February 4 Letter").   (Lipin Tr. 545:15-546:1, 550:3-

11; Lipin Ex. 34).

**RESPONSE:**


74.     The February 4 Letter stated in part:

. . . I am the primary care physician of Dr. Alexander Lipin.  He has been suffering
from a pneumonia and is undergoing treatment.  He is improving.  He has been out
of work since 1/27 and I would ask that he continue to be out of work until Feb. 17,
2015 as he is continuing to recover.

 (Lipin Tr. 550:3-20, 551:16-22; Lipin Ex. 34, SMG000113).

**RESPONSE:**

75.     Thereafter, Lipin did not apply for or ask to take a leave of absence on his own initiative; instead, the Hospital reached out to Lipin to notify him that he needed to take a leave. (Lipin Tr. 541:20-543:9, 591:2-9, 595:2-18).

**RESPONSE:**


76.     On February 6, 2015, Sophia Maniaci, a HR/Benefits Physician Specialist for Holy Family, sent an email to Lipin marked "high importance," which stated that pursuant to SMG policy, he needed to apply for a leave of absence from SMG for his time off from work, because his time off had exceeded five days.  (Lipin Tr. 589:14-15, 590:2-5, 590:10-591:13, 592:19-22; Lipin Ex. 36).

**RESPONSE:**


77.     On February 10, 2015, Mulholland also emailed Lipin, and marked the email "high importance."  (Lipin Tr. 593:5-19; Lipin Ex. 37).  Mulholland stated that (1) she had received information from Lipin's supervisor that Lipin had been out of work since January 27, 2015 due to a medical condition; and (2) Steward's policy required him to apply for a leave of absence because he had been absent for more than five days.  (Lipin Tr. 593:5-594:2; Lipin Ex. 37).  She also attached to her email Steward's Leave of Absence Policy, a FMLA Notification Form and an FMLA Source Flyer.  (Lipin Tr. 594:2-15; Lipin Ex. 37; *see also* Mulholland Tr. 41:12-43:20, 156:17-157:1).

**RESPONSE:**


78.     Later on February 10, Lipin submitted to SMG a completed Leave of Absence Notification Form, in which he listed his expected date of return as February 17, 2015, and to

which he attached the February 4 Letter.  (Lipin Tr. 596:12-598:8, 599:1-5, 600:7-20; Lipin Ex. 38).

**RESPONSE:**

**X.     On February 13, 2015, Clairmont Learned that Lipin Had Been Working Full-Time at Anna Jacques Hospital while on Leave from Holy Family**

79.     On February 12, 2015, Lipin emailed Walsh, and stated in part, "Due to [sic] slow progress of my recovery I need to extend my medical leave for few more days with new target day to return back to work on Monday February 23, 2015."  (Lipin Tr. 604:3-7, 605:18-606:14; Lipin Ex. 39).  Walsh responded, "Wishing you a speedy recovery Alex.. take care."  (Lipin Tr. 606:15-607:9; Lipin Ex. 39).

**RESPONSE:**

80.     On February 13, 2015 (after Clairmont had already made the decision to terminate Plaintiff's employment), Clairmont learned for the first time that Lipin had been working at Anna Jacques at the same time that he had been on a leave of absence from his work at Holy Family.  (Clairmont Tr. 95:19-96:1, 96:10-97:6, 98:16-99:5, 105:6-11; *see* Lipin Tr. 53:5-10, 57:12-19, 60:23-61:2, 61:9-16, 443:21-444:11, 551:16-22; *see also* Mulholland Tr. 105:23-106:8; Hedge-Batlivala Tr. 50:4-12).

**RESPONSE:**

81.     Lipin admits that even though he reported to Holy Family that he was unable to work between January 27 and February 17, 2015, he continued to work in a full-time position at

Anna Jacques during that time, appearing at the facility for each of his scheduled shifts and seeing patients.  (Lipin Tr. 443:21-444:11, 551:16-22, 553:6-16, 554:16-21, 557:4-16, 580:21-581:1).

**RESPONSE:**


82.     Lipin also admits that between January 27 and March 1, 2015, he never requested time off from his position at Anna Jacques due to pneumonia, and never reduced his patient load. (Lipin Tr. 443:12-20, 447:20-448:2, 556:17-557:3).

**RESPONSE:**


83.     Clairmont was astonished to learn that Lipin was working at Anna Jacques while on a leave of absence from Holy Family.  (Clairmont Tr. 96:10-21, 137:7-10).  Clairmont had never in his career as a primary care physician, during which he took care of patients with pneumonia many times over many years, told a patient that the patient could work at one place but not at another place, nor has he ever seen it done.  (Clairmont Tr. 102:3-18, 104:5-10, 137:7-138:16; Clairmont Ex. 8; *see also* Hedge-Batlivala Tr. 50:4-12).

**RESPONSE:**


**XI.     In About Mid-February 2015, Clairmont Decided that Lipin's Termination Would Be Classified as a Termination Not-For-Cause**

84.     At some point between February 13 and February 19, 2015, after consulting with counsel, Clairmont decided to invoke the not-for-Cause provisions in terminating Lipin's employment contract because he wanted to avoid what he perceived to be unnecessary complications that arise in the context of a for Cause termination.  (Clairmont Tr. 59:10-19, 63:8-11, 107:17-20, 108:17-22, 109:2-6, 120:16-18); Mulholland Tr. 107:22-108:2, 109:20-110:5).  In

addition, Clairmont has never terminated a physician for Cause during his (Clairmont's) employment with SMG.  (Clairmont Tr. 59:17-19, 65:21-66:2).

**RESPONSE:**

85.     It is commonplace for SMG to terminate physicians on a not-for-Cause basis, even where physicians have engaged in misconduct, because for Cause terminations tend to be much more adversarial and disruptive.  (Mulholland Dec. ¶ 15).

**RESPONSE:**

86.     On or about Friday, February 20, 2015, Mulholland sent an email to Clairmont, in which she stated that she had contacted Lipin to let him know that if he would be returning to work on Monday, February 23 (as scheduled), she wanted to schedule an in-person meeting with him that day.  (Mulholland Tr. 171:15-172:14; Mulholland Ex. 17; *see also* Supp. Int. Rsp., p. 4).

**RESPONSE:**

87.     Mulholland planned to have Lipin meet with herself, Alexander and Hedge-Batlivala upon his return to Holy Family, so that they could notify him of his termination in person. (Mulholland Tr. 169:19-22, 171:15-172:14; Mulholland Ex. 17; Alexander Tr. 140:10-18, 141:7-142:9; Alexander Ex. 11; Hedge-Batlivala Tr. 82:11-19).

**RESPONSE:**

**XII.    On February 23, 2015, SMG Terminated Lipin's Employment**

88.    Lipin did not return from leave on February 23 as expected; instead, on February 20, he requested an extension of his leave until March 2, 2015.  (Lipin Tr. 607:21-609:13, 611:20-612:11; Lipin Ex. 40).  SMG granted the request.  (Lipin Tr. 620:16-621:9).

**RESPONSE:**


89.    Because Lipin did not return to work at Holy Family on February 23, he did not meet with Mulholland, Alexander and Hedge-Batlivala that day.  (Hedge-Batlivala Tr. 83:9-14, 84:23-85:3; Alexander Tr. 142:23-143:6; Mulholland Tr. 170:6-9, 172:17-20).

**RESPONSE:**


90.    On February 23, Mulholland telephoned Lipin to inform him that SMG decided to terminate Lipin's Employment Contract not-for-Cause.  (Mulholland Tr. 170:6-18, 172:17-22).

**RESPONSE:**


91.    The same day (February 23), Mulholland sent Lipin a letter stating that SMG was terminating Lipin's Employment Contract, invoking the provision of the agreement providing for termination at any time without Cause  (Lipin Tr. 622:11-623:14; Lipin Ex. 42; Mulholland Tr. 170:12-14, 215:15-17).   Consistent with the termination provisions of Lipin's Employment Contract, the letter stated that Lipin's termination would be effective as of May 24, 2015 (90 days later).  (Lipin Tr. 622:11-623:18; Lipin Ex. 42).

**RESPONSE:**

92.     After Lipin was notified of his termination, the Hospital discontinued his services at Holy Family, effective immediately, but continued to pay him his base salary for the duration of his employment with SMG (*i.e.*, through May 24, 2015).  (Lipin Tr. 622:11-18, 624:17-625:9; Lipin Ex. 42; Mulholland Tr. 82:24-83:5; *see also* Mulholland Tr. 71:1-4).

**RESPONSE:**


**XII.    Lipin Admits that He Was Not Discriminated Against on the Basis of His Medical Condition and Has No Evidence of Discrimination**

93.     Lipin testified that he cannot think of any evidence that anyone affiliated with SMG or Holy Family had some sort of a bias against people with pneumonia or people who have a respiratory condition.  (Lipin Tr. 645:16-646:24).  He further testified that Defendants' Counsel's inquiry as to whether he could think of such evidence "sounds so funny, . . . Biased of people with pneumonia.  How people even know that pneumonia . . . I am just amazed with this question . . . It's a funny question."  (Lipin Tr. 645:16-646:4).

**RESPONSE:**


94.     Also in response to Defendants' Counsel's inquiry as to whether he had any evidence that anyone affiliated with SMG or the Hospital had some sort of a bias against people with pneumonia, Lipin testified, "The question is about discrimination? . . . I don't think anybody discriminated for this, according to my knowledge."  (Lipin Tr. 645:16-646:19).

**RESPONSE:**

95.     Lipin never heard anyone affiliated with SMG or Holy Family make negative comments or comments that Lipin found to be offensive about individuals who have pneumonia or acute respiratory conditions.  (Lipin Tr. 644:21-645:10).

**RESPONSE:**


96.     Lipin never heard anyone affiliated with SMG or Holy Family make negative or offensive comments of any kind about people with acute respiratory conditions.  (Lipin Tr. 645:11-15).

**RESPONSE:**


97.     At no point during Lipin's employment with SMG did he apply for a form of medical leave that was denied.  (Lipin Tr. 620:16-621:9, 622:2-7).

**RESPONSE:**


98.     Other than the leave of absence Lipin took beginning on January 26, 2015, Lipin never requested any accommodation from SMG or Holy Family.  (Lipin Tr. 644:5-19).

**RESPONSE:**


99.     SMG granted Lipin the full length of his FMLA leave.  (Lipin Tr. 620:16-621:9).

**RESPONSE:**

DATED: January 29, 2018                    Respectfully submitted,

                                           STEWARD HEALTHCARE SYSTEM, LLC,
                                           STEWARD MEDICAL GROUP, INC., AND
                                           HOLY FAMILY HOSPITAL,

                                           By their attorneys:

                                           */s/        Barry J. Miller*
                                           Barry J. Miller (BBO# 661596)
                                           bmiller@seyfarth.com
                                           Anne S. Bider (BBO# 682142)
                                           abider@seyfarth.com
                                           Seyfarth Shaw LLP
                                           Two Seaport Lane, Suite 300
                                           Boston, MA 02210-2028
                                           Telephone: (617) 946-4800
                                           Fax: (617) 946-4801

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2018, this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.  In addition, on January 29, 2018, a copy of this document was served upon counsel for Plaintiff Alexander Lipin by e-mail and U.S. Mail, at the following location:

> Kavita M. Goyal
> KGoyal@rosenlawoffice.com
> Emilie Grossman
> Egrossman@rosenlawoffice.com
> Rosen Law Office, PC
> 204 Andover Street, Suite 402
> Andover, MA 01810

                                           */s/  Barry J. Miller*
                                           Barry J. Miller